# United States Court of Appeals
## For the First Circuit

No. 00-2408

NORTH AMERICAN SPECIALTY INSURANCE COMPANY,

Plaintiff, Appellant,

v.

DAVID LAPALME ET AL.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Joseph L. Tauro, U.S. District Judge]

Before

Boudin, Chief Judge,

Selya, Circuit Judge,

and Schwarzer,* Senior District Judge.

Peter B. McGlynn, with whom Bruce D. Levin and Bernkopf, Goodman & Baseman LP were on brief, for appellant.
Warren D. Hutchison, with whom Nancy M. Reimer and Donovan Hatem LP were on brief, for appellees.

August 2, 2001

_____
*Of the Northern District of California, sitting by designation.

**SELYA, Circuit Judge.** Audit reports and financial statements are staples of the accounting profession. Accuracy is a paramount concern, for much can turn on a relatively minor bevue. But mistakes occur, and courts have grappled with the extent of an accountant's liability to third parties (i.e., non-clients) for such errors. This appeal requires us to enter the fray.

The case at hand involves ostensible misstatements attributed to the carelessness of the defendants (an accounting firm and one of its principals). The court below, ruling on a motion for summary judgment, concluded that even if the financial statement prepared by the defendants for their client corporation contained negligent misrepresentations, the defendants were not liable to the plaintiff (a third party) for those misrepresentations. Although our appraisal of the governing law differs in one salient respect from that of the lower court, we reach the same conclusion. Accordingly, we affirm.

## I. BACKGROUND

A brief recitation of the facts suffices to put the pivotal legal issue into perspective. Following the conventional summary judgment praxis, we recount the facts in the light most favorable to the nonmovant (here, the plaintiff).

Houlton Citizens' Coalition v. Town of Houlton, 175 F.3d 178, 184 (1st Cir. 1999).

In the 1980s, Jeffrey Canty formed Canty Roofing and Sheetmetal, Inc. (CRS). As the name implies, CRS's principal business was the installation and repair of roofs. For much of CRS's existence, the firm of Dias & Lapalme (D&L) rendered accounting services to it. The partner in charge was David Lapalme. For the most part, the work was mundane, involving, inter alia, the preparation of annual financial statements and tax returns.

Over the years, CRS installed and repaired roofs on a variety of public and private buildings. Contractors working on public construction projects in Massachusetts are required by statute to post payment and performance bonds on a project-by-project basis. See Mass. Gen. Laws ch. 149, § 29. CRS routinely bid on public works jobs and, thus, from time to time required bonds.

In 1994, Martin Donovan, an insurance broker, introduced CRS to plaintiff-appellant North American Specialty Insurance Co. (NASI). At Donovan's instance, NASI inspected CRS's financial records and Canty's personal finances. Apparently satisfied with the results of its review, NASI entered into a bonding relationship with CRS. Once this

relationship commenced, NASI told Canty that CRS would be required to provide updated financial statements, prepared by an independent certified public accountant, for each succeeding calendar year.

In late 1995, Canty agreed to sell CRS to a group composed of three businessmen, namely, Robert Cote, Paul Flynn, and David Beasley. The transfer of ownership, structured as a sale of stock, occurred on December 29, 1995. Shortly thereafter, D&L prepared an independent, review-level financial statement for CRS with respect to calendar year 1995. This statement, issued by D&L on March 25, 1996, lacked specific information anent the change in ownership. To make matters worse, the notes to the financial statement contained three arguably misleading comments that implied Canty's continuing participation as CRS's sole shareholder (or so NASI now contends). We summarize these comments in the margin.[1]

CRS thereafter obtained new contracts for work on public buildings. To facilitate these engagements, NASI wrote

---

[1]In "Note D - Notes Payable," D&L indicated the CRS's line of credit was secured, inter alia, by "a personal guarantee by the Corporation's sole stockholder." In "Note F - Related Party Transactions," D&L reported both that "[t]he Company is involved in a related party transaction through the rental of equipment from a corporation wholly owned by the same stockholder," and that "[t]he Company is involved in a related party transaction through the rental of real estate owned by the stockholder."

bonds (relying, it claims, on the 1995 financial statement) totaling $847,630 on June 14, 1996, and bonds totaling $874,500 on August 21, 1996. But CRS foundered under the stewardship of its new owners and eventually defaulted on these bonds. This calamity forced NASI, qua surety, to step into the breach. Doing so cost it nearly $2,000,000.

Invoking diversity jurisdiction, 28 U.S.C. § 1332(a), NASI sued D&L and Lapalme in the United States District Court for the District of Massachusetts. It charged the accountants with negligent misrepresentation and deceptive trade practices. NASI grounded its complaint on the assertion that, but for the accountants' omission of accurate ownership information in the 1995 financial statement, it would not have continued furnishing bonds for CRS (and, therefore, would have avoided the ensuing losses). After allowing an extended period for pretrial discovery, the district court granted summary judgment in the defendants' favor.

This timely appeal ensued. In it, NASI challenges the district court's interpretation and application of the legal regime governing an accountant's liability to third persons and maintains that, under a proper formulation of the law, the existence of genuine issues of material fact would preclude the entry of summary judgment.

-6-

## II.  SOME THRESHOLD PRINCIPLES

We preface our discussion of the central issue with a reminder as to certain threshold principles that inform our analysis.  Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  In reviewing an order granting summary judgment, we construe the record and all reasonable inferences from it in favor of the summary judgment loser. Grant's Dairy-Me., LLC v. Comm'r of Me. Dep't of Agric., Food & Rural Res., 232 F.3d 8, 14 (1st Cir. 2000); Houlton Citizens' Coalition, 175 F.3d at 184.  Our review is plenary, so that we may, "if the occasion arises, reject the rationale employed by the lower court and still uphold its order for summary judgment."  Perez v. Volvo Car Corp., 247 F.3d 303, 310 (1st Cir. 2001) (citation and internal quotation marks omitted).

In this diversity case, we look to state law (here, the law of Massachusetts) for the substantive rules of decision. Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938); Fithian v. Reed, 204 F.3d 306, 308 (1st Cir. 2000).  In such matters, we are bound by the teachings of the state's highest court.

-7-

Blinzler v. Marriott Int'l, Inc., 81 F.3d 1148, 1151 (1st Cir. 1996). "In the absence of a definitive ruling by the highest state court, a federal court may consider analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand . . . ." Gibson v. City of Cranston, 37 F.3d 731, 736 (1st Cir. 1994) (citation and internal quotation marks omitted). Our duty is to make an informed prophecy — to "discern the rule the state's highest court would be most likely to follow under these circumstances, even if our independent judgment might differ." Ambrose v. New Engl. Ass'n of Schs. & Colls., 252 F.3d 488, 497-98 (1st Cir. 2001).

## III. NEGLIGENT MISREPRESENTATION

Against this backdrop, we turn to the law pertaining to accountants' liability to third parties for negligent misrepresentation and, in particular, the watershed opinion of the Massachusetts Supreme Judicial Court (SJC) in Nycal Corp. v. KPMG Peat Marwick LLP, 688 N.E.2d 1368 (Mass. 1998). We next examine the decision below and discuss an area of disagreement. We then offer our views on the meaning, under Massachusetts law, of the phrase "substantially similar transactions" as that phrase relates to an accountant's liability to third parties for

negligent misrepresentations.  Finally, we apply the discerned law to the gleaned facts to complete our canvass.

## A.  __The Watershed Case__.

Nycal v. KPMG Peat Marwick LLP is the SJC's most comprehensive effort to plot the borders of an accountant's liability to third parties for negligent misrepresentations.  In that case, the plaintiffs – purchasers of stock – alleged that they had relied to their determent on financial statements prepared for the acquired company by the defendant (a well-known accounting firm).  Nycal, 688 N.E.2d at 1369.  After studying the available options,[2] the SJC adopted the Restatement rule anent the scope of an accountant's liability to a third party for negligent misrepresentations.  Id. at 1370-71 (citing with approval Restatement (Second) of Torts § 552 (1977)).  The SJC's description of the rule follows:

> Section 552 describes the tort of negligent misrepresentation committed in the process of supplying information for the guidance of others as follows:  (1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others

_____

[2]Other possible tests for determining the scope of an accountant's liability to third parties include the foreseeability test (imposing broad liability) and the near-privity test (constricting liability).  See Bily v. Arthur Young & Co., 834 P.2d 745, 752-57 (Cal. 1992) (discussing these theories).

in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

That liability is [(2)] limited to loss suffered (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

Id. at 1371-72 (internal quotation marks omitted).

The SJC recognized that section 552 was not self-elucidating, and that courts had been erratic in interpreting and applying it. Id. at 1372. This lack of uniformity seemed most readily apparent in respect to the level of knowledge — actual or constructive — required on the part of the putative defendant. The SJC opted to demand actual knowledge. Id. In so doing, it interpreted section 552 "as limiting the potential liability of an accountant to noncontractual third parties who can demonstrate actual knowledge on the part of accountants of the limited – though unnamed – group of potential third parties that will rely upon the [accountant's work product], as well as actual knowledge of the particular financial transaction that such information is designed to influence." Id. (citations and

internal quotation marks omitted).  The accountant's actual knowledge, the court added, should be ascertained at the time the audit report or financial statement is issued.  Id. at 1372-73.

Despite this emphasis on actual knowledge, the SJC added a caveat.  It cautioned that accountants could not avoid liability by burying their heads in the sand:  "the Restatement standard will not excuse an accountant's 'willful ignorance.'"  Id. at 1373.

## B.  **The Decision Below**.

The district court appropriately acknowledged Nycal as the starting point for its analysis.  The fulcrum of the court's unpublished opinion is its determination that the SJC had not fully embraced the Restatement rule, but, rather, had rejected the language of section 552(2)(b) (which extends an accountant's liability beyond particular transactions that the accountant knowingly intended to influence to substantially similar transactions).  In reaching this conclusion, the veteran district judge relied on the fact that the Nycal court, at one point in its opinion, referred to "actual knowledge of the particular financial transaction," 688 N.E.2d at 1372, without including the Restatement's reference to substantially similar transactions.  Having embraced this narrow reading of Nycal, the

-11-

judge envisioned that the case at hand hinged on whether the defendants "knew of the particular financial transaction that the [financial statement] was designed to influence."[3] Discerning no evidence that D&L actually knew, in March of 1996, of a particular bonding transaction scheduled to occur later that year, Judge Tauro entered judgment for the defendants.

In effect, then, the district court held that substantially similar transactions, by definition, could not reach the level of particularity that Nycal required. NASI vigorously attacks this holding, and we think that it may read too much into what might well be an economy of words. After all, the SJC mentioned the "substantially similar transactions" variant in its initial recital of the rule, Nycal, 668 N.E.2d at 1372, and we can think of three reasons why the court's omission of this reference in its reprise may well lack decretory significance. First, the language and structure of Nycal point toward outright acceptance of the Restatement rule, uncurtailed. See, e.g., id. at 1371 (remarking that the Restatement rule "comports most closely" with the standard of liability

[3]To reach this point in its analysis, the court first found that the record contained sufficient evidence to create trialworthy issues as to whether the accountants, at the time they issued the financial statement, knew that CRS would forward it to NASI and that NASI would rely on it for some underwriting purpose.

traditionally imposed by the Massachusetts courts in other professional contexts).  Second, Nycal itself did not involve a dispute about whether transactions were or were not substantially similar (and, thus, the SJC had no incentive to discuss that aspect of the Restatement rule in any detail). Third, the Nycal court's language requiring "actual knowledge of a particular financial transaction," id. at 1372, just as easily can be read to incorporate substantially similar transactions as to exclude them.[4]

In the end, we need not probe this point too deeply. The extent to which Massachusetts accepts the Restatement rule is a matter of state law, and the SJC some day will resolve all doubt.  For now, we assume arguendo, favorably to NASI, that Massachusetts follows the rule of section 552 of the Restatement, without reservation.  That rule limits an accountant's liability for negligent misrepresentation to those

---

[4]The SJC quoted this language from First Nat'l Bank of Commerce v. Monco Agency Inc., 911 F.2d 1053, 1062 (5th Cir. 1990), in connection with a discussion of the level of knowledge required under the Restatement rule.  In Monco Agency, the Fifth Circuit, applying state law, found that Louisiana followed the Restatement rule.  The court then opined that section 552 imposed an "actual knowledge" requirement. Id. at 1061-62.  The court made clear, however, that such a requirement did not eliminate liability for substantially similar transactions.  See id. at 1061 (explaining that "the misinformer must know that its client intends to use the inaccurate information to influence a particular business transaction, or a 'substantially similar transaction,' to follow").

third parties who the accountant actually knows will receive the information, and then, only for transactions that are the same as, or substantially similar to, the ones which the accountant actually knows will be influenced by the supplied information. In other words, an accountant remains potentially liable in situations in which he actually knows that a third-party recipient of his information will rely on that information in the course of a specific transaction, even though the transaction itself does not transpire, as long as it is supplanted by a substantially similar transaction.

## C. **Defining Substantially Similar Transactions**.

Although substantially similar transactions can serve as a basis for an accountant's liability to a third party under the Restatement rule, the dimensions of that doctrine remain in doubt.[5] Our interest, of course, is in how the Massachusetts courts would define the term — but neither the SJC nor the Massachusetts Appeals Court has addressed this issue.

---

[5]We have located only a single case that explores the reach of this rule. In that case, an audit had been performed and a report developed with knowledge that Creditor "A" would rely on it. Creditor "B" later sued the accounting firm, asserting that the audit report contained a negligent misrepresentation. The court refused to impose liability, finding that the transaction's essential character had changed. ML-Lee Acquis. Fund, L.P. v. Deloitte & Touche, 463 S.E.2d 618, 628-29 (S.C. Ct. App. 1995), rev'd in part on other grounds, 489 S.E.2d 470 (S.C. 1997).

The Restatement does not attempt to define the phrase "substantially similar transactions." Nevertheless, the commentary offers some insight into what is meant by the term. Thus, when a corporation seeking a bank loan asks an accountant to audit the books and prepare a report for the prospective lender, liability for negligence will attach even though the corporation delays for a month in obtaining the loan. See Restatement (Second) of Torts § 552 cmt. j. The transaction, though later in time, remains substantially similar because its "essential character" – the amount and terms of the credit – has not changed. Id. So too if the amount of the anticipated loan varies slightly, the ensuing transaction nonetheless will remain substantially similar; slight variances do not affect a transaction's essential character. Id. If, however, after the accountant's report is delivered the corporation seeks and receives a much larger loan, the transactions will no longer be substantially similar and the accountant will not be liable to the bank for a careless misstatement. Id.

In the last analysis, "[t]he question [is] one of the extent of the departure that the maker of the representation understands is to be expected." Id. Minor deviations are to be anticipated in complex business transactions, and such deviations ordinarily do not allow the misinformer to escape

-15-

liability to a known third party. If the departure is major, however, a different result obtains; the transaction actually consummated cannot then be regarded as essentially the same as the transaction originally contemplated (and, therefore, cannot be regarded as substantially similar).

Quite plainly, this definition is fact-sensitive and requires case-by-case development. We think that, under it, an accountant's liability for substantially similar transactions must be determined in two steps. First, the rule implicitly recognizes that the risk perceived by the accountant at the time of the engagement cabins the extent of the duty that he owes to known third parties. Cf. Rusch Factors, Inc. v. Levin, 284 F. Supp. 85, 91 (D.R.I. 1968) (advocating this proposition prior to promulgation of the final version of the Restatement rule); Ryan v. Kanne, 170 N.W.2d 395, 401-02 (Iowa 1969) (same; citing draft version of the Restatement). Thus, an inquiring court initially must consider, from the preparer's standpoint, what risks he reasonably perceived he was undertaking when he delivered the challenged report or financial statement.

Second, the court must undertake an objective comparison between the transaction of which the accountant had actual knowledge and the transaction that in fact occurred. This comparison cannot be hypertechnical, but, rather, must be

conducted in light of "[t]he ordinary practices and attitudes of the business world."  Restatement (Second) of Torts § 552 cmt. j.  The goal of this inquiry is to determine whether the two transactions share essentially the same character.  If so, the actual transaction is substantially similar to the contemplated transaction (and, therefore, liability-inducing). Elsewise, the third party has no recourse against the accountant for negligent misrepresentation.

### D.  **The Merits**.

With these guideposts in place, we turn to the case at hand.  To recapitulate, the district court granted summary judgment for the defendants because it found insufficient evidence to show that they had actual knowledge of the critical transactions (i.e., the issuance of several bonds on which CRS eventually defaulted).  In so holding, however, the court employed a "same transaction" standard, to the exclusion of substantially similar transactions.  We now employ the more inclusive standard (assuming, albeit without deciding, that the SJC would adopt it in an appropriate case).

The Restatement rule has six elements.  A finding of liability requires (1) inaccurate information, (2) negligently supplied, (3) in the course of an accountant's professional endeavors, (4) to a third person or limited group of third

-17-

persons whom the accountant actually intends or knows will receive the information, (5) for a transaction that the accountant actually intends to influence (or for a substantially similar transaction), (6) with the result that the third party justifiably relies on such misinformation to his detriment. See Nycal, 688 N.E.2d at 1371-72. The third party has the burden of proving each of these elements. Consequently, he must create a trialworthy issue on all six in order to avoid the entry of summary judgment. See McIntosh v. Antonino, 71 F.3d 29, 33 (1st Cir. 1995) (discussing the burden of production that devolves upon a nonmovant who bears the ultimate burden of persuasion on an issue underlying a summary judgment motion). Creating such an issue necessitates the production of "specific facts, in suitable evidentiary form." Id. (citation and internal quotation marks omitted).

Assuming, for argument's sake, that the evidence, viewed in the light most favorable to NASI, suffices to limn genuine issues of material fact on five of the six elements,[6] the

_____

[6]On these five elements, NASI has proffered evidence aimed at showing that the notes to the financial statement contained misinformation about whether Canty remained the sole stockholder of CRS; and that D&L, which knew the true facts, negligently prepared and released the misleading financial statement to CRS in the ordinary course of D&L's business, knowing that CRS planned to submit it to NASI (and intending to influence NASI's consideration of the status of the bonds outstanding on ongoing projects). NASI also proffered some evidence tending to show

question reduces to whether NASI's issuance, in 1996, of the particular bonds upon which CRS defaulted constituted transactions that D&L actually sought to influence, or, alternatively, substantially similar transactions. NASI would have us answer this question affirmatively for three reasons. We examine these reasons separately.

First, NASI argues that the bonds which it issued in 1996 were part of a regular "bonding program" and that D&L prepared the financial statement with this program in mind. To buttress this argument, NASI describes its relationship with CRS as common in the industry, explaining that sureties typically "prequalify" contractors for underwriting purposes, establishing maximum limits on both individual and aggregate bonds. Such bonding programs, NASI tells us, usually stay in place for a year at a time.

While this trade usage might be conventional – NASI neglected to offer any evidence of trade usage below – the proper focus is on the accountant's actual knowledge and intent to influence. See Nycal, 688 N.E.2d at 1372; Spencer v. Doyle, 733 N.E.2d 1082, 1087 (Mass. App. Ct. 2000). Regardless of how NASI perceived the situation, the critical issue is what the

that it relied on the misinformation in writing the 1996 bonds (although this issue, in particular, is hotly disputed).

defendants actually knew, when they released the financial statement, about NASI's intent to use the statement in deciding whether to maintain a bonding program which involved writing new bonds for CRS in 1996.  See Nycal, 688 N.E.2d at 1372-73.  The evidence here, even when viewed in a light favorable to NASI, does not support a conclusion that the defendants intended to undertake the risk of a full year's worth of bonds.

To establish the defendants' actual knowledge and intent to influence, NASI relies most heavily on Cote's deposition.  Cote testified in substance that once he and his partners had acquired the stock of CRS, he met with Lapalme to discuss the preparation of the 1995 financial statement.  At that time, he informed Lapalme that CRS's new owners planned to use the financial statement to meet the corporation's obligations for "ongoing" bonds (which he described as "projects that were currently being worked on by [CRS] for which bonds had been issued").  Cote specifically disclaimed having told Lapalme that the financial statement would be used to obtain future bonds, and NASI points to no other hard evidence to fill this gap.

Taken at face value, Cote's testimony does not support a conclusion that the defendants knowingly undertook the substantial risks inherent in the issuance of future bonds.  To

the contrary, an objectively reasonable accountant in Lapalme's position doubtless would have thought, based on Cote's request, that he was subjecting his firm to possible liability for NASI's inventory of bonds previously issued (those that related to CRS's "ongoing" construction contracts), not for NASI's forward-looking bonding program. Since no reasonable jury could have concluded otherwise, NASI failed to show facts sufficient to support its "bonding program" hypothesis.

If more were needed – and we doubt that it is – the surrounding circumstances suggest how improbable it is that D&L would have been willing to undertake liability for future bonds. Lapalme was keenly aware that the preparation of the 1995 financial statement was likely to be D&L's last engagement for CRS. Cote testified that he and his partners had begun looking for a new accountant by the time that D&L completed its work on the 1995 financial statement. This was to be expected: D&L had been retained to handle the CRS account by the former owner, Canty, and the purchase-and-sale agreement obligated the new owners to retain D&L only until the firm had completed the tax returns and other financials necessary to close out calendar year 1995. It strains credulity to believe that an experienced C.P.A. would undertake liability for indeterminate amounts of

bonds not yet written when he had no reasonable anticipation of working for the principal in the future.

NASI next contends that the defaulted bonds represented transactions which were substantially similar to those that the defendants intended to influence. Here, however, as we shortly will show, the 1996 bond transactions plainly did not share the essential character of the earlier transactions about which the defendants knew (and which they intended to influence). Accordingly, the two sets of transactions cannot be considered substantially similar.

To be sure, determinations of this type involve matters of degree. If, for example, D&L had agreed to release the 1995 financial statement in anticipation of allowing NASI to review it before issuing a $500,000 bond for a specific future project, and NASI thereafter issued a bond for that project in an amount that varied by, say, $50,000, D&L would be liable to NASI for any loss occasioned by a negligent misrepresentation.[7] See Restatement (Second) Torts § 552 cmt. j. Similarly, if D&L had agreed to provide the 1995 financial statement in anticipation

_____

[7]This and subsequent examples are merely our best predictions, based on the sparse case law now available, as to how the "substantially similar transactions" rubric will unfold in specific situations. The examples are subject to reconsideration if actual cases presenting the same facts arise or if further enlightenment emerges from the Massachusetts courts.

of allowing NASI to review it before bonding a project that was slated to start on May 1, but the project did not get underway until June 15, D&L would still be liable.  Id.  In each instance, the key is the accounting firm's actual knowledge of the surety's intention to rely on the financial statement for a specific purpose — deciding whether to issue a bond in a known amount for a known project.  The firm thus could anticipate its likely exposure from attempting to influence the surety's decision, and the imposition of liability for negligence should not be defeated by modest variances that the firm, given the way in which business transactions typically develop, reasonably could have anticipated.  See id.

In this context, there is no scientific formula for ascertaining substantial similarity.  Even if the change involves a new transaction, rather than merely a modification of the earlier (known) transaction, the accounting firm might still be held liable if the identity of the third party is unchanged, the type of transaction pretty much the same, and the firm's exposure relatively constant.  Imagine, for example, that D&L agreed to provide the financial statement in anticipation that NASI would review it in deciding whether to write a $500,000 bond referable to a specific roofing contract that CRS hoped to secure.  Imagine, too, that the project fell through, but CRS

-23-

instead obtained a different, roughly comparable roofing contract, likewise requiring a $500,000 bond, and NASI, relying on the financial statement, provided the bond. In that hypothetical situation, D&L likely would be liable to the surety for misinformation. See id. cmt. j, illus. 15.

There is an obvious difference between these examples and the case at hand. The examples presume that the accountants knew the general nature of the risk they were taking and the approximate dollar amount of their potential liability. In this case, however, D&L accepted potential liability only for ongoing work — known projects in various stages of completion — but NASI seeks to hold the firm liable for unknown future projects not yet begun (or even bid) when the financial statement was delivered. The increased degree of risk is patent. By like token, D&L accepted potential liability only for bonds previously issued — bonds with fixed, easily ascertainable dollar limits — but NASI seeks to hold D&L liable for bonds which, at the relevant time, were not yet issued (and which, therefore, had no monetary limit). Those bonds would be written for whatever sums the contract documents might require. Once again, the increased degree of risk is patent. Consequently, the liability that NASI wishes us to impose on the defendants is well beyond the outermost frontier of Massachusetts law. It is

not liability for transactions substantially similar to the ones which D&L knowingly undertook to influence, but for new transactions that differ in their essential character and entail a new, unanticipated level of risk.

That ends this aspect of the matter. Without some evidence that the defendants knew that they were undertaking additional, open-ended liability with respect to future bonds by releasing the financial statement, NASI's second argument founders. Simply because transactions are of the same general nature (e.g., "bonds") is not enough to render them substantially similar for purposes of the Restatement rule. Any other conclusion would make a mockery of a basic premise that underbraces the Restatement rule: that an acquiescent accountant is only deemed to accept the risks of specific transactions that were made known to him in advance (or substantially similar ones). See Bily v. Arthur Young & Co., 834 P.2d 745, 769 (Cal. 1992) (holding that an accountant is liable for negligent misrepresentation to a third party only if he knowingly supplies the information for the benefit of the third party, and the information is relied on by the third party in a transaction previously identified to the accountant, or a substantially similar transaction).

In a last-ditch effort to impose liability, NASI lodges a claim of willful blindness. It asserts that D&L, through Lapalme, closed its eyes to commercial realities in a struthious attempt to avoid liability for future transactions. The legal foundation on which this argument rests is impeccable. See Nycal, 688 N.E.2d at 1373 ("[T]he Restatement standard will not excuse an accountant's 'willful ignorance.'"). However, the record does not lend substance to NASI's allegations.

NASI points to three facts which it claims show willful blindness. First, it notes that the dollar amount of the bonds issued for CRS in 1996 was on the same order of magnitude as the aggregate dollar amount of the bonds underwritten for CRS in 1995. This proves nothing of significance. The defendants were not made privy to CRS's plans for the future. Without such knowledge, the past year's experience was not likely to be a reliable indicator of a future course of dealings (especially given the changes in CRS's ownership and management). In all events, there is no evidence that the defendants were informed either that CRS, as reconstituted, would continue to use NASI as its principal bonding source or that NASI intended to use the 1995 financial statement as a basis for evaluating the advisability of issuing future bonds. Absent such forewarning, knowledge of past practice would be irrelevant in this context.

-26-

NASI next suggests that D&L should have asked the new owners what types of bonds CRS might need in 1996. The problem with this suggestion is that D&L was retained to do a retrospective account of CRS's finances as of December 31, 1995. Hence, any inquiry into CRS's future plans would have been gratuitous.

Finally, NASI harps on D&L's practice of asking Canty how many copies of the financials he would need. NASI argues that the incidence of multiple copies should have put D&L on guard. We are at a loss to follow NASI's logic. D&L knew all along, through Lapalme's conversation with Cote, that CRS would supply a copy of the 1995 financial statement to NASI. The relevant question, therefore, was not who received the financial statement but for what purpose it was tendered.

We need not paint the lily. NASI has failed to identify any plausible evidence of willful blindness or otherwise to demonstrate the existence of a genuine issue of material fact as to the defendants' actual knowledge of a substantially similar, loss-inducing transaction. Accordingly, we uphold the district court's entry of summary judgment in the defendants' favor on the negligent misrepresentation claim. See Perez, 247 F.3d at 310 (explaining that the court of appeals may

affirm a summary judgment on any ground made manifest by the record).

## IV.   THE CHAPTER 93A CLAIM

NASI originally pleaded a claim, arising out of the same facts, for deceptive trade practices.  See Mass. Gen. Laws ch. 93A, § 2(a).  The district court granted summary judgment for the defendants on that claim.  In its opening brief to this court, NASI offered no developed challenge to the correctness of that ruling.  In its reply brief, however, NASI attempts to remedy this omission.  Its attempt fails.

There are few principles more securely settled in this court than the principle which holds that, absent exceptional circumstances, an appellant cannot raise an argument for the first time in a reply brief.  E.g., Aulson v. Blanchard, 83 F.3d 1, 7 (1st Cir. 1996); Pritzker v. Yari, 42 F.3d 53, 71 n.19 (1st Cir. 1994); Mesnick v. Gen. Elec. Co., 950 F.2d 816, 829 n.11 (1st Cir. 1991); Sandstrom v. ChemLawn Corp., 904 F.2d 83, 87 (1st Cir. 1990).  NASI flagrantly violated that established principle.  At any rate, the belatedly asserted claim is weak and NASI has cited no exceptional circumstances which might excuse the claim's omission from its opening brief.  Given those verities, we see no basis for overlooking NASI's procedural default.

-28-

## V. CONCLUSION

We need go no further. This is a novel case, made easier because it was well presented by able advocates on both sides. In the end, we are confident that the law is not so elastic as NASI maintains, and that the core claim asserted here falls beyond the scope of an accountant's liability to a third party. Accordingly, we uphold the entry of summary judgment in the defendants' favor.

**Affirmed.**