# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

GARY ELLIS,
                    *Plaintiff-Appellee,*

v.                                          No. 07-1352

GRANT THORNTON LLP,
                    *Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of West Virginia, at Bluefield.
David A. Faber, Chief District Judge.
(1:04-cv-00043)

Argued: March 19, 2008

Decided: June 25, 2008

Before DUNCAN, Circuit Judge, HAMILTON,
Senior Circuit Judge,
and William L. OSTEEN, Jr., United States District Judge
for the Middle District of North Carolina,
sitting by designation.

Reversed by published opinion. Senior Judge Hamilton wrote the
opinion, in which Judge Duncan and Judge Osteen joined.

## COUNSEL

**ARGUED:** Stanley Julius Parzen, MAYER BROWN, L.L.P., Chi-
cago, Illinois, for Appellant. Benjamin Lee Bailey, BAILEY &
GLASSER, L.L.P., Charleston, West Virginia, for Appellee. **ON**

**BRIEF:** John H. Tinney, Kimberley R. Fields, THE TINNEY LAW FIRM, P.L.L.C., Charleston, West Virginia; Bradley J. Andreozzi, MAYER BROWN, L.L.P., Chicago, Illinois; Mark W. Ryan, Andrew J. Morris, MAYER BROWN, L.L.P., Washington, D.C., for Appellant. Eric B. Snyder, BAILEY & GLASSER, L.L.P., Charleston, West Virginia, for Appellee.

---

## OPINION

HAMILTON, Senior Circuit Judge:

The principal issue presented in this appeal is whether Grant Thornton LLP (Grant Thornton), an accounting firm retained by First National Bank of Keystone (Keystone), in response to an investigation by the Office of the Comptroller of the Currency (OCC) into Keystone's banking activities, owed a duty of care under the West Virginia law of negligent misrepresentation to Gary Ellis, who allegedly relied on oral statements made by Stan Quay (Quay), a Grant Thornton partner, and a Grant Thornton audit report of Keystone's 1998 financial statements in deciding to accept the job as president of Keystone. We hold that Grant Thornton owed Ellis no such duty under West Virginia law. Accordingly, we reverse the judgment of the district court, which found in favor of Ellis on his negligent misrepresentation claim against Grant Thornton.

I

In late June 1999, the OCC began to intensify its ongoing investigation into Keystone's banking activities. The OCC's investigation revealed that Keystone's books overstated the value of the loans Keystone owned by over $515 million. Based on these overstatements, Keystone was declared insolvent and was closed on September 1, 1999. This case is yet another case that comes before this court in the wake of Keystone's collapse. *See Gariety v. Vorono*, No. 06-2248, 2008 WL 110906 (4th Cir. January 8, 2008) (unpublished) (civil action filed by individuals who purchased Keystone stock between September 28, 1998 and September 1, 1999); *FDIC v. Bakkebo*, 506 F.3d 286 (4th Cir. 2007) (civil action brought by FDIC); *Gariety v.*

*Grant Thornton, LLP*, 368 F.3d 356 (4th Cir. 2004) (securities class action by persons who purchased stock prior to Keystone's failure); *United States v. Cherry*, 330 F.3d 658 (4th Cir. 2003) (criminal appeal); *United States v. Church*, 11 Fed. App'x. 264 (4th Cir. 2001) (unpublished) (same). This case concerns Ellis, who took the job as president of Keystone in April 1999. According to Ellis, he took the position only because he relied on negligent misrepresentations made by Quay and made by Grant Thornton in the audit report.

A

Prior to 1992, Keystone was a small community bank providing banking services to clients located primarily in McDowell County, West Virginia. Before its collapse, Keystone was a national banking association within the Federal Reserve System, the deposits of which were insured by the FDIC.

In 1992, Keystone began to engage in an investment strategy that involved the securitization of high risk mortgage loans. Between 1992 and 1998, Keystone originated nineteen securitizations. In general, Keystone would acquire Federal Housing Authority or high loan to value real estate mortgage loans from around the United States, pool a group of these loans, and sell interests in the pool through underwriters to investors. The pooled loans were serviced by third-party loan servicers, including companies like Advanta and Compu-Link. Keystone retained residual interests (residuals) in each loan securitization. The residuals were subordinated securities that would receive payments only after all expenses were paid and all investors in each securitization pool were paid. Thus, Keystone stood to profit from a securitization only after everyone else was paid in full. The residuals were assigned a value that was carried on the books of Keystone as an asset. Over time, the residual valuations came to represent a significant portion of Keystone's book value.

From 1993 until 1998, when the last loan securitization was completed, the size and frequency of these transactions expanded from about $33 million to approximately $565 million for the last one in September 1998. All told, Keystone acquired and securitized over 120,000 loans with a total value in excess of $2.6 billion.

The loan securitization business appeared to be quite profitable. On paper, Keystone's assets grew from $107 million in 1992 to over $1.1 billion in 1999. In reality, however, the securitization program proved highly unprofitable. Due to the risky nature of many of the underlying mortgage loans, the failure rate was excessive. As a result, the residual interests retained by Keystone proved highly speculative and, in actuality, they did not perform well.

Keystone's valuation of the residuals was greater than their market value. J. Knox McConnell, Keystone's largest shareholder until his death, Terry Church (Church), another Keystone director, and others concealed the failure of the securitizations by falsifying Keystone's books. Bogus entries and documents hid the true financial condition of Keystone from the bank's directors, shareholders, depositors, and federal regulators.

Keystone's irregular bank records drew the attention of the OCC, which began an investigation into Keystone's banking activities. This investigation revealed major errors in Keystone's accounting records that financially jeopardized Keystone. In May 1998, the OCC required Keystone to enter into an agreement obligating Keystone to take specific steps to improve its regulatory posture and financial condition. This agreement required Keystone to, among other things, retain a nationally recognized independent accounting firm "to perform an audit of the Bank's mortgage banking operations and determine the appropriateness of the Bank's accounting for purchased loans and all securitizations." (J.A. 3043). In August 1998, Keystone retained Grant Thornton as its outside auditor.

Under the agreement between Grant Thornton and Keystone, Grant Thornton was to, among other things, perform for Keystone, in accordance with Generally Accepted Auditing Standards (GAAS), an audit of Keystone's consolidated financial statements as of December 31, 1998. Quay was the lead Grant Thornton partner on the Keystone audit. Susan Buenger (Buenger), a junior manager, performed substantial work on the audit as well.

Grant Thornton performed the audit on Keystone's 1998 financial statements. Keystone's 1998 financial statements reflected ownership of more than $515 million in loans that it did not own. Due to negli-

gence on the part of both Quay and Buenger, Grant Thornton's audit did not uncover the $515 million discrepancy.[1] In fact, on March 24, 1999, Quay presented several members and prospective members of Keystone's board and Keystone's shareholders with draft copies of Keystone's 1998 financial statements and told them that Keystone was going to get an unqualified or "clean" audit opinion on its 1998 financial statements. (J.A. 2701).[2] At the shareholders meeting the

---

[1]Grant Thornton does not challenge the district court's finding of negligence in this appeal, electing to assume, for the sake of argument, that Quay and Buenger were negligent in preparing the audit and making any statements concerning the soundness of Keystone's financial condition. Given Grant Thornton's position, we, too, will assume, without deciding, that Quay and Buenger were negligent in preparing the audit and making any statements concerning the soundness of Keystone's financial condition.

[2]Although accountants provide a variety of services to clients, their primary function is auditing. Samuel S. Paschall, *Liability to Non-Clients: The Accountant's Role and Responsibility*, 53 Mo. L. Rev. 693, 698 (1988). In a typical audit, the financial statements of an entity, usually a corporation, are verified by examining the corporation's accounting records and supporting evidence. *Id.* After examining such records and evidence, the accountant expresses an opinion as to whether such statements fairly represent the corporation's actual financial position in accordance with the Generally Accepted Accounting Principles (GAAP). *Id.* at 698-99. For practical reasons of cost and time, an accountant is rarely able to examine every accounting transaction of a corporation. Denise M. Orlinsky, Note, *An Accountant's Liability to Third Parties: Bily v. Arthur Young & Co.*, 43 DePaul L. Rev. 859, 862 (1994). Therefore, the performance of an audit requires a high degree of professional skill and judgment, as the accountant can only test the output of the corporation's accounting systems. *Id.* In performing an audit, an accountant follows procedures outlined in the GAAS. *Id.* The end result of an audit is the audit report or opinion, which evaluates the information obtained to determine whether the corporation's financial statements fairly represent the financial position of the corporation in accordance with the GAAP. *Id.* at 863-64. The audit opinion is usually expressed in a letter addressed to the client and can be one of four types: an unqualified audit opinion, a qualified audit opinion, an adverse audit opinion, or a disclaimer audit opinion. *Id.* at 864. An unqualified audit opinion is an expression of opinion by the accountant without any exceptions, reservations, or qualifications that the financial statements of the corporation

next day, Quay also distributed copies of Keystone's financial statements. At that time, Quay reiterated that Keystone was going to get a clean audit opinion on its 1998 financial statements.

On April 19, 1999, even though Keystone was, in fact, insolvent as of the end of 1998, Grant Thornton issued and delivered to Keystone's board its audit opinion stating that Keystone's financial statements were fairly stated in accordance with the GAAP and reflecting a shareholder's equity of $184 million. The intent of the report was plainly stated on the first page of the report: "This report is intended for the information and use of the Board of Directors and Management of The First National Bank of Keystone and its regulatory agencies and should not be used by third parties for any other purpose." (J.A. 2903).

The audited financial statements provided by Quay to the board on April 19, 1999 were substantially the same as the financial statements Quay had provided board members and shareholders in March 1999. Based on Grant Thornton's audit report, Keystone's board continued to declare dividends and operate the bank.

B

In 1984, Gary Ellis was President of the Bank of Dunbar. The Bank of Dunbar was later merged into United National Bank (United) at which time Ellis joined the management team at United, eventually

---

represent its financial position and the results of its operations. *Id.* A qualified audit opinion, on the other hand, states that improper accounting treatment has been applied to one or more items and that, consequently, the financial statements are not in compliance with the GAAP. *Id.* at 865. An adverse audit opinion is issued if any items have a material and pervasive effect on the financial statement, thus destroying their fairness of presentation. *Id.* A disclaimer audit opinion is issued if the accountant is unable to form an opinion because of serious limitations on the scope of the examination of the audit. *Id.* at 866. Typically, the corporation then uses this audit opinion for its own business planning, and the audit opinion is used to inform outside parties as to the financial health of the audited company. Paschall, *Liability to Non-Clients: The Accountant's Role and Responsibility*, 53 Mo. L. Rev. at 699.

becoming its president. From the time of the merger with the Bank of Dunbar until the time Ellis left United, United more than doubled in size. In 1998, United merged with George Mason Bankshares of Virginia. In the spring of 1999, following the merger, Ellis voluntarily began looking for employment outside United. Ellis had dealt with Keystone in the past, and, on March 19, 1999, Billie Cherry (Cherry), chairman of Keystone's board, called Ellis and invited Ellis to attend Keystone's annual shareholders meeting on March 25, 1999. During the call, Cherry suggested that Ellis should consider becoming president of Keystone.

Ellis was not fired or told to leave United, had no deadline for leaving United, and could have remained at United rather than leaving for the Keystone position. Ellis attended Keystone's board meeting on March 24, 1999, at which the board granted Ellis' request to review, upon the signing of a confidentiality agreement, the financial condition of the bank. Although it is not clear from the record whether a confidentiality agreement was signed, the Keystone board permitted Ellis to discuss the financial condition of the bank with Quay and other Keystone insiders with the understanding that the information be kept confidential. Consequently, following the Keystone board meeting on March 24, 1999, Ellis met Quay and two other outside directors at a bar at the Fincastle Country Club. Quay spoke with Ellis and the two outside directors because Keystone did not have a chief financial officer, thus making Quay the only person capable of going over the financial statements with the others. At the country club, Quay told Ellis and the two outside directors that Keystone was going to receive a "clean [audit] opinion." (J.A. 401). Ellis also attended the March 25, 1999 shareholders' meeting at which Quay informed the group that Grant Thornton was going to give Keystone a clean audit opinion for 1998. On March 30, 1999, Ellis visited Keystone. During this visit, Quay told Ellis once again that Keystone would receive a clean audit opinion for 1998.

On April 2, 1999, Ellis met with his attorneys to draft a proposed employment agreement with Keystone. During the first two weeks of April 1999, Ellis met with Church and others regarding their expectations for him. It was decided that Ellis would be responsible for the "banking" business at Keystone as opposed to the mortgage loan securitizations. On April 19, 1999, at a Keystone board meeting, Ellis

reviewed Grant Thornton's final audit report on Keystone for 1998. The board voted to approve Ellis' hiring as president of Keystone. Ellis officially resigned from United by letter dated April 20, 1999. Ellis' employment contract was signed on April 26, 1999.[3] According to Ellis, he relied on Grant Thornton's audit, which was consistent with Quay's earlier March 1999 statements that Grant Thornton was going to issue a clean audit opinion for 1998, in deciding to accept the job as president of Keystone.

C

After being named as a defendant in the *Gariety v. Grant Thornton, LLP* securities class action, Ellis filed a cross-claim against Grant Thornton for negligent misrepresentation under West Virginia law in which he sought to recover damages in the form of lost earnings. The district court consolidated Ellis' negligent misrepresentation claim for trial with the claims asserted by the FDIC in *FDIC v. Grant Thornton, LLP*, 1:00-cv-0655, (S.D.W.Va. January 15, 2004) (order). The case was tried in the summer of 2004. In March 2007, the district court ruled in favor of Ellis on his negligent misrepresentation claim and found that he was entitled to $2,419,233 in damages. The district court found that, in accepting the job as president of Keystone, "Ellis relied on the financial statements Quay gave him," "Quay's oral representations," and the Grant Thornton audit report. (J.A. 2706). The district court also found that "Quay intended and knew that Ellis would rely on his statements." (J.A. 2707). In view of these findings of fact, the district court concluded that Grant Thornton, as the auditor of Keystone, was liable to Ellis under the West Virginia law of negligent misrepresentation, citing *First National Bank of Bluefield v. Crawford*, 386 S.E.2d 310 (W. Va. 1989), because Grant Thornton (through Quay's oral statements and the audit report) made negligent misrepresentations concerning the financial condition of Keystone knowing that Ellis would receive and rely upon those representations in making his decision to accept or reject employment with Keystone. After ruling in favor of Ellis, the district court deconsolidated Ellis' negligent misrepresentation claim from the FDIC's claims against

---

[3]Ellis signed a two-year contract at a base salary of $375,000, plus benefits including the use of a corporate vehicle and a country club membership. He also purchased $49,500 in Keystone stock.

Grant Thornton and entered judgment in favor of Ellis in the amount of $2,419,233. Grant Thornton noted a timely appeal.

II

On appeal from a bench trial, we may set aside the district court's findings of fact only if they are clearly erroneous. *Minyard Enter., Inc. v. Southeastern Chem. & Solvent Co.*, 184 F.3d 373, 380 (4th Cir. 1999); Fed. R. Civ. P. 52(a). In determining whether a finding of fact is clearly erroneous, we must give due regard to the opportunity of the district court to judge the credibility of the witnesses. Fed. R. Civ. P. 52(a). A finding of fact is clearly erroneous when, "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948).

As a federal court sitting in diversity, we have an obligation to apply the jurisprudence of West Virginia's highest court, the Supreme Court of Appeals of West Virginia. *Wells v. Liddy*, 186 F.3d 505, 527-28 (4th Cir. 1999). In a situation where the state's highest court has spoken neither directly nor indirectly on the particular issue before us, we are called upon to predict how that court would rule if presented with the issue. *Id.* In this case, we are called upon to predict whether, under the facts of this case, Grant Thornton owed Ellis a duty of care under the West Virginia law of misrepresentation.

In *Bank of Bluefield*, the Supreme Court of Appeals of West Virginia addressed the question of whether the lack of privity of contract between an accountant and a bank was a complete defense to the bank's suit against the accountant for professional negligence in preparing a financial statement. 386 S.E.2d at 310-11. The court answered that question in the negative. *Id.* at 315. In *Bank of Bluefield*, the bank alleged that the accountant had been professionally negligent in preparing a financial statement for a construction company upon which the bank had relied in determining whether to give the construction company a loan. The parties stipulated that: (1) the bank informed the accountant that it would need the financial statement prior to the October 5, 1984 closing of the loan; (2) the financial statement was delivered to the bank before the closing date; (3) the

bank alleged that it reasonably relied on the financial statement in making the loan to the construction company; and (4) there was no privity of contract between the bank and the accountant. The state trial court in *Bank of Bluefield* held that, in the absence of contractual privity between the parties, the bank could not recover from the accountant. *Id.* at 311.

In resolving the issue before it, the court in *Bank of Bluefield* discussed the four approaches to resolving the question of under what circumstances an accountant can be liable to third parties for a negligent misrepresentation. *Id.* at 311-13. The first of these approaches was announced in *Ultramares Corp. v. Touche*, 174 N.E. 441 (N.Y. 1931), which held that negligence actions were only permitted by parties in privity of contract or in a situation so close as to approach that of privity. *Id.* at 182-83. The second approach was also developed by the New York Court of Appeals, which slightly modified the *Ultramares Corp.* approach in 1985. *See Credit Alliance Corp. v. Arthur Andersen & Co.*, 483 N.E.2d 110 (N.Y. 1985) (relaxing the strict *Ultramares Corp.* privity doctrine by requiring a relationship "sufficiently approaching privity").[4] The third approach is set forth in § 552 of the Restatement (Second) of Torts. Under this approach, a person or a limited class of persons who the auditor can foresee as parties who will (and do) rely upon financial statements are allowed to recover. Restatement (Second) of Torts § 552(1)-(2). The fourth approach is the reasonably foreseeable approach, which permits all parties who are reasonably foreseeable recipients of financial statements for business purposes to recover as long as they rely on the

---

[4]*Credit Alliance Corp.* announced the following three-prong test for determining whether an accountant can be held liable for negligence to a third party who has detrimentally relied on inaccurate financial statements: (1) the accountant must have been aware that the financial reports were to be used for a particular purpose or purposes; (2) in the furtherance of which a known party or parties was intended to rely; and (3) there must have been some conduct on the part of the accountant linking him to that party or parties, which evinces the accountant's understanding of that party or parties' reliance. 483 N.E.2d at 118. The *Credit Alliance Corp.* approach is often referred to as the "near-privity" approach. *First Nat'l Bank of Commerce v. Monco Agency, Inc.*, 911 F.2d 1053, 1058 (5th Cir. 1990).

statements for those business purposes. *See, e.g.*, *H. Rosenblum, Inc. v. Adler*, 461 A.2d 138, 142-46 (N.J. 1983).[5]

After summarizing these four approaches, the court in *Bank of Bluefield* adopted the Restatement § 552 approach for West Virginia, finding that the rule stated therein was "more appropriate because it imposes a standard of care only to known users who will actually be relying on the information provided by the accountant." 386 S.E.2d at 313; *see also id.* at 310 Syllabus of the Court ("In the absence of privity of contract, an accountant is liable for the negligent preparation of a financial report only to those he knows will be receiving and relying on the report.").[6] In view of the court's adoption of the Restatement approach in *Bank of Bluefield*, the court answered the certified question—was privity a defense—in the negative. *Id.* at 315. Consequently, other than the adoption of the Restatement approach,

---

[5]Although it is sometimes difficult to discern the differences between the four approaches, appropriate lines can be drawn between the restrictive *Ultramares Corp.*, *Credit Alliance Corp.*, and Restatement approaches and the nonrestrictive foreseeability approach. For example, although the Restatement's approach expands liability to a larger potential class of third parties than do the *Ultramares Corp.* and *Credit Alliance Corp.* approaches, it does not extend liability beyond an identified third party, a known third party, or third parties who enter into the same type of transaction as originally contemplated. In other words, under the *Ultramares Corp.* and *Credit Alliance Corp.* approaches, "the precise identity of the informational consumer [must] be foreseen by the auditor," *Monco Agency, Inc.*, 911 F.2d at 1059, but, under the Restatement approach, the precise "informational consumer" need not be known, *id.*; rather the Restatement approach "contemplates identification of a narrow group, not necessarily the specific membership within that group." *Id.* Moreover, unlike the foreseeability approach, the Restatement approach does not extend to "every reasonably foreseeable consumer of financial information." *Id.* at 1060.

[6]We note that the *Bank of Bluefield* court did not identify what constitutes a "known" user, the definition of which is important to separate the third parties entitled to recover under the Restatement approach and not entitled to recover under the *Ultramares Corp.* and *Credit Alliance Corp.* approaches. Such a demarcation, however, was not essential to the *Bank of Bluefield* court's rejection of these approaches, so its failure to employ precise cabining language is understandable.

the *Bank of Bluefield* court gave no further meaningful guidance concerning under what circumstances an accountant can be liable to third parties for negligent misrepresentations under § 552.

Restatement (Second) of Torts § 552 provides in relevant part:

(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

(2) [T]he liability stated in Subsection (1) is limited to loss suffered

(a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

(b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

Restatement (Second) of Torts § 552(1)-(2). The Restatement approach is deliberately restrictive to encourage the free flow of commercial information. *See id.* § 552, cmt. ("By limiting the liability for negligence of a supplier of information to be used in commercial transactions to cases in which he manifests an intent to supply the information for the sort of use in which the plaintiff's loss occurs, the law promotes the important social policy of encouraging the flow of commercial information upon which the operation of the economy rests."). It also seeks to protect suppliers of commercial information from liability in instances in which they oblige themselves to provide information but the terms of the obligation are unknown to them. *See*

*id.* ("A user of commercial information cannot reasonably expect its maker to have undertaken to satisfy this obligation unless the terms of the obligation were known to him.").

Although the West Virginia Supreme Court of Appeals in *Bank of Bluefield* did not set forth what must be proven by an injured third party proceeding under § 552 against an accountant for the accountant's negligent misrepresentations, other courts have set forth six elements that essentially track the language of the Restatement. *See, e.g., N. Am. Specialty Ins. Co. v. Lapalme*, 258 F.3d 35, 41-42 (1st Cir. 2001) (setting forth six elements). Under this authority, a finding of liability requires the injured party to prove (1) inaccurate information, (2) negligently supplied, (3) in the course of an accountant's professional endeavors, (4) to a third person or limited group of third persons for whose benefit and guidance the accountant actually intends or knows will receive the information, (5) for a transaction (or for a substantially similar transaction) that the accountant actually intends to influence or knows that the recipient so intends, (6) with the result that the third party justifiably relies on such misinformation to his detriment. *Id.* The third party has the burden of proving each of these elements. *Id.* at 42. Moreover, the accountant's "actual knowledge . . . should be ascertained at the time the audit report or financial statement is issued." *Id.* at 39, 42.

In this case, the record simply is devoid of evidence suggesting that Ellis proved the fourth, fifth, and sixth elements. With regard to the fourth element, it is clear that Ellis failed to show that Grant Thornton knew (or intended) that potential employees, like Ellis, were intended to receive the audit report for their benefit and guidance. The audit report was delivered to the board of directors of Keystone. The audit report plainly states that the audit report was *not* intended for use by third parties. Rather, the audit report was prepared for the benefit of Keystone and the OCC, which is entirely consistent with the agreements between Keystone and the OCC and between Keystone and Grant Thornton. Thus, Ellis, or any other potential employee, was not a member of any limited group of persons for whose benefit the audit report was prepared.

Perhaps recognizing the tenuousness of relying on the audit report itself, especially since he signed his employment contract a week after

the audit report was issued to the board, Ellis relies heavily on Quay's statements in March 1999 indicating that Grant Thornton was going to give Keystone a clean audit opinion.[7] Of course, reliance on Quay's statements improves the position of Ellis, as Quay's statements did not include a disclaimer. However, the Restatement approach instructs that we should assess cases in light of "[t]he ordinary practices and attitudes of the business world." Restatement (Second) of Torts § 552, cmt. j. Viewed in this light, it is clear that Grant Thornton was Keystone's auditor and was hired to conduct an audit for the benefit of Keystone and the OCC. Grant Thornton was not hired to go over with each potential employee the soundness of Keystone's financial condition. Indeed, throughout most of the course of the audit report's preparation, Ellis was an unknown, unidentified potential employee of Keystone. Grant Thornton was not aware of the existence of the potential employment transaction between Ellis and Keystone until *after* Grant Thornton reached its decision to give Keystone a clean audit opinion. If the scope of the audit involved potential employees, one would expect at least some knowledge on the part of Grant Thornton *before* they formed their audit opinion.

Moreover, Quay first informed the board of directors on March 24, 1999 that Grant Thornton was going to give Keystone a clean audit opinion. Thus, the clean audit opinion information was disclosed for the benefit of Keystone's board and not potential employees such as Ellis. Ellis' attempt at turning Quay's clean audit opinion statements into ones for his benefit, by virtue of his meetings with Quay, ignores the business reality that Grant Thornton was hired and performed the audit for the benefit of Keystone and the OCC. It also ignores the fact that any release of information to Ellis was done at the behest of Keystone, not Grant Thornton. There is no evidence in the record to support the conclusion that Ellis was a member of any limited group of persons for whose benefit Quay's statements were made.

---

[7]Grant Thornton claims that oral statements can never form the basis of liability under § 552 when such statements are made before the release of the final audit opinion. We need not decide this issue because, even assuming as we do for purposes of this appeal that oral statements made before the release of the final audit opinion can form the basis of auditor liability under § 552, Ellis cannot prevail.

Our conclusion concerning the fourth element is buttressed by Illustration 10 in § 552. That illustration provides:

> A, an independent public accountant, is retained by B Company to conduct an annual audit of the customary scope for the corporation and to furnish his opinion on the corporation's financial statements. A is not informed of any intended use of the financial statements; but A knows that the financial statements, accompanied by an auditor's opinion, are customarily used in a wide variety of financial transactions by the corporation and that they may be relied upon by lenders, investors, shareholders, creditors, purchasers and the like, in numerous possible kinds of transactions. In fact B Company uses the financial statements and accompanying auditor's opinion to obtain a loan from X Bank. Because of A's negligence, he issues an unqualifiedly favorable opinion upon a balance sheet that materially misstates the financial position of B Company, and through reliance upon it X Bank suffers pecuniary loss. A is not liable to X bank.

*Id.* § 552, cmt. h, illus. 10. Illustration 10, we believe, is materially indistinguishable from our case. Like the accountant in the illustration, Grant Thornton was not aware of an intended use of its audit opinion beyond the customary business planning use of an audit opinion by a corporation such as Keystone and the use by the OCC for oversight, as it was hired "to conduct an annual audit of the customary scope for [Keystone] and to furnish [its] opinion on [Keystone's] financial statements." *Id.* Indeed, Grant Thornton was not aware that any potential employee of Keystone was going to base their decision to seek employment with Keystone on the outcome of the audit. Rather, in performing its audit function, Grant Thornton was aware that its audit opinion and any statements made leading up to the issuance of the audit opinion *may* be relied upon by shareholders, investors, and perhaps potential employees such as Ellis. However, more than a tenuous awareness of this sort is required to impose liability on Grant Thornton. To hold otherwise would transform the Restatement approach into the foreseeability approach, which the court in *Bank of Bluefield* clearly rejected. Ellis was required to show that Grant Thornton knew that its audit opinion would be used by Key-

stone to assist potential employees in making their decision concerning whether to come to work for Keystone. The record simply does not demonstrate that Ellis made such a showing.

With regard to the fifth element's substantiality requirement, we examine two questions. First, we examine, from the accountant's standpoint, what risks he reasonably perceived he was undertaking when he delivered the challenged report or financial statement. *Lapalme*, 258 F.3d at 41. If the accountant is unaware of a potential risk, then liability cannot attach. Next, we make an objective comparison between the transaction to which the accountant had actual knowledge and the transaction that in fact occurred. *Id.* This comparison cannot be hypertechnical, but, rather, must be conducted in light of customary business world practices and attitudes. Restatement (Second) of Torts § 552, cmt. j. "The goal of this inquiry is to determine whether the two transactions share essentially the same character. If so, the actual transaction is substantially similar to the contemplated transaction (and, therefore, liability-inducing)." *Lapalme*, 258 F.3d at 41.

When Grant Thornton issued its audit report, it was not assuming the risk that third parties would rely on the report. As noted above, the report itself states that it is not to be used by third parties. To the extent that Ellis relied on Quay's statements, it cannot be said that Grant Thornton was assuming the risk of being liable for Ellis' future lost earnings. The audit opinion was formed by the time Quay met with Ellis, and Quay was simply repeating information that was earlier disclosed to the Keystone board in his presence.

With regard to the objective comparison, the liability of the maker of a negligent misrepresentation extends "to all transactions of the type or kind that the maker intends or has reason to expect." Restatement (Second) of Torts § 552, cmt. j. For example, "independent public accountants who negligently make an audit of books of a corporation, which they are told is to be used only for the purpose of obtaining a particular line of banking credit, are not subject to liability to a wholesale merchant whom the corporation induces to supply it with goods on credit by showing him the financial statements and the accountant's opinion." *Id.* Moreover, an accountant who negligently conducts an audit for A corporation knowing that A corporation is

going to show the audit to B corporation as a basis for the extension of credit from B corporation is not liable to B corporation if B corporation buys a controlling interest in A corporation in reliance upon the audit. *Id.* § 552, cmt. j, illus. 14. Thus, when the character of the transaction materially changes, there is no liability. *See Lapalme*, 258 F.3d at 44 ("Even if the change involves a new transaction, rather than merely a modification of the earlier (known) transaction, the accounting firm might still be held liable if the identity of the third party is unchanged, the type of transaction pretty much the same, and the firm's exposure relatively constant.").

Here, Grant Thornton was hired to conduct an audit of Keystone. It was aware at the time it was hired and during the auditing process that the audit was being done for the benefit of Keystone and the OCC. It was not aware during this process that its audit was being performed for the benefit of potential employees of Keystone. Indeed, there simply is no evidence in the record that Grant Thornton cared one way or the other who Keystone hired or whether Ellis became president of Keystone. In fact, Ellis was not even on the radar screen until *after* Grant Thornton concluded that it was going to issue Keystone a clean audit opinion. Moreover, any release of information to Ellis was done at the behest of Keystone, not Grant Thornton. This fact further suggests that Grant Thornton never intended to deviate from its standard auditing functions. In short, to find the fifth element satisfied, we would have to materially change the transaction from an audit undertaken to benefit Keystone and the OCC to one intended to benefit potential employees of Keystone. Such a material change to the nature of the transaction is prohibited under the Restatement approach.

Ellis fares no better on the sixth element. Unquestionably, given that the audit report stated that it was not intended for use by third parties, Ellis could not justifiably rely on the audit report in signing his employment contract with Keystone. With regard to Quay's oral assurances, likewise, Ellis could not justifiably rely on those statements. First, Ellis was aware at the time he signed his employment contract that the audit report was not to be used by third parties. A person as sophisticated and experienced in the banking business as Ellis is, he knew he could not justifiably rely on Quay's statements when the report itself stated otherwise. Moreover, as previously

noted, Quay's statements concerning the clean audit opinion were offered by Quay to the board and the shareholders to apprise the board and the OCC of Keystone's financial condition. They were not offered to induce individuals to accept employment with Keystone. As such, it is difficult to discern how an individual as sophisticated and experienced as Ellis would justifiably rely on this information in accepting a job at Keystone.

## III

For the reasons stated herein, the judgment of the district court is reversed.

*REVERSED*